*Creditincome Limited v. The Swiss Confederation*

IN THE

# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2025

ARGUED: JUNE 25, 2026
DECIDED: JULY 16, 2026

No. 25-2733

CREDITINCOME LIMITED, CREDITINCOME PENSION SCHEME, DOUBLE PLATEAU HOLDINGS LLC, GI RUI CO., LTD., RED WHITE INVESTMENT, LTD., RUI GI LOU INTERNATIONAL CO., LTD, SOLAR TALENT INTERNATIONAL LIMITED, SPRINGCORE LTD, WESTONBIRT FUND LP, THE NOMURA TRUST AND BANKING CO., LTD., AS TRUSTEE FOR 039909706, ALLIANCEBERNSTEIN GLOBAL HIGH INCOME MOTHER FUND, AB SICAV I - ALL MARKET INCOME PORTFOLIO, AB CANADA CORE PLUS ADVANCED BOND FUND, AB BOND FUND, INC. - AB BOND INFLATION STRATEGY, AB SICAV I - GLOBAL INCOME PORTFOLIO, SKYMARK COMPANY S.A., SANFORD C. BERNSTEIN FUND, INC. - AB INTERMEDIATE DURATION PORTFOLIO, AB SICAV I - GLOBAL PLUS FIXED INCOME PORTFOLIO, AB ACTIVE ETFS, INC. - AB HIGH YIELD ETF, KAMINA HOLDINGS LIMITED, AB SICAV I - SHORT DURATION INCOME PORTFOLIO, AB CANADA CORE PLUS LONG DURATION BOND FUND, SONG WEN TYNG, KSH FINANCIAL HOLDINGS LIMITED, CUSTODY BANK OF JAPAN, LTD, AS TRUSTEE FOR 01229−1001/119701, ALLIANCEBERNSTEIN HIGH YIELD OPEN, AB SICAV I - US HIGH YIELD PORTFOLIO, AB FCP I - AMERICAN INCOME PORTFOLIO, AB SICAV I - GLOBAL DYNAMIC BOND PORTFOLIO, AB SICAV I - SUSTAINABLE EURO HIGH YIELD PORTFOLIO, AB SICAV I - FINANCIAL CREDIT PORTFOLIO, RAYMOND B.V.I. LIMITED, AB HIGH INCOME FUND, INC, ALLIANCEBERNSTEIN GLOBAL HIGH INCOME FUND, INC., AB BOND FUND, INC. - AB TOTAL RETURN BOND PORTFOLIO, ALLIANCEBERNSTEIN DYNAMIC GLOBAL FIXED INCOME FUND, CUSTODY

BANK OF JAPAN, LTD., AS TRUSTEE FOR 01729-9180/901080, AB GLOBAL HYBRID SECURITIES MOTHER FUND, AB ACTIVE ETFS, INC. - AB SHORT DURATION INCOME ETF, EXCLUSIVE PLUS PROJECT MANAGEMENT, ZHANG SHERWIN, AB FCP I - GLOBAL HIGH YIELD PORTFOLIO, AB LP, AB COLLECTIVE INVESTMENT TRUST SERIES - AB US HIGH YIELD COLLECTIVE TRUST, SANFORD C. BERNSTEIN FUND, INC. - OVERLAY B PORTFOLIO, AB CANADA CORE PLUS BOND FUND, SANFORD C. BERNSTEIN FUND II, INC. – BERNSTEIN INTERMEDIATE DURATION INSTITUTIONAL PORTFOLIO, BYBROOK CAPITAL MASTER FUND LP, LUEN PO BVI, AB BOND FUND, INC. - AB INCOME FUND,

*Plaintiffs-Appellants*,

*v.*

THE SWISS CONFEDERATION,

*Defendant-Appellee*.

————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

————

Before: CALABRESI, CHIN, MERRIAM, *Circuit Judges*.

In late 2022 and early 2023, Switzerland allegedly directed Credit Suisse to sell itself to another Swiss bank, UBS. Switzerland advanced the merger by, *inter alia*, unilaterally negotiating with UBS on Credit Suisse's behalf, extending loans and loss guarantees to the parties, and enacting laws to facilitate the transaction. Switzerland also ordered Credit Suisse to write down $17.3 billion in bond liabilities to make the transaction more palatable to UBS. Bondholders brought claims arising from the write-down order against Switzerland in U.S. district court, asserting that Switzerland lacks immunity under the Foreign Sovereign Immunities Act because the write-down order was "in connection with a commercial activity": Switzerland's "brokering" of the merger. The district court dismissed the complaint for lack of subject matter jurisdiction. We affirm.

————————————————

2

JOHN F. BASH, Quinn Emanuel Urquhart & Sullivan, LLP, Austin, TX; *with* Alex H. Loomis, Quinn Emanuel Urquhart & Sullivan, LLP, Boston, MA; and Dennis H. Hranitzky, Quinn Emanuel Urquhart & Sullivan, LLP, Salt Lake City, UT, *for Plaintiffs-Appellants*.

ANITHA REDDY, Wachtell, Lipton, Rosen & Katz, New York, NY; *with* William P. Savitt and Tala A. Doumani, Wachtell, Lipton, Rosen & Katz, New York, NY, *for Defendant-Appellee*.

---

CALABRESI, *Circuit Judge*:

This appeal arises from a suit against Defendant-Appellee the Swiss Confederation ("Switzerland"), a foreign state. In late 2022 and early 2023, Switzerland allegedly directed the Swiss bank Credit Suisse AG ("Credit Suisse") to sell itself to another Swiss bank, UBS Group AG ("UBS"). Plaintiffs-Appellants are beneficial owners of securities issued by Credit Suisse who claim that Switzerland, as part of its efforts to facilitate the merger, unlawfully ordered Credit Suisse to write their investments down to zero.

The Foreign Sovereign Immunities Act ("FSIA") provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of the statute's enumerated exceptions is met. 28 U.S.C. § 1604. Plaintiffs seek to proceed against Switzerland under the FSIA's so-called "commercial activity exception." Under that exception, as relevant here, a foreign

3

state can be sued for an act taken "outside the territory of the United States" taken "in connection with a commercial activity" when "that act causes a direct effect in the United States." *Id.* § 1605(a)(2).

The U.S. District Court for the Southern District of New York (Ho, *J.*) granted Switzerland's motion to dismiss for lack of subject matter jurisdiction on the ground that the purported "commercial activity" proffered by Plaintiffs in support of jurisdiction—Switzerland's "brokering" of the merger—was not commercial in nature. We affirm.

## BACKGROUND

The facts, as stated below, are drawn from Plaintiffs' complaint. We assume their truth for purposes of evaluating Switzerland's motion to dismiss.

Before its acquisition by UBS in 2023, Credit Suisse was one of Switzerland's two largest and systemically important banks. "[I]n the 2010s and early 2020s, [Credit Suisse] became enmeshed in fraud and corruption scandals, leading to massive fines, civil litigation, and resulting capital outflows." App'x 45 (Compl. ¶ 81). "All this hurt Credit Suisse's stock price, which trended slowly downwards over the course of the 2010s." App'x 47 (Compl. ¶ 87). By late 2022, depositors were rapidly withdrawing funds from Credit Suisse.

4

Swiss authorities took note of the challenges facing Credit Suisse and "prepared potential rescue plans." App'x 47 (Compl. ¶ 88). One option was to place Credit Suisse into a receivership to "restructure [its] assets and liabilities." App'x 43 (Compl. ¶ 74). Another option was a "temporary nationalization of Credit Suisse." App'x 47 (Compl. ¶ 89). Switzerland, however, ultimately favored a third option, which it called, perhaps unwisely, a "commercial solution": "brokering" a "[t]akeover" of Credit Suisse by UBS. App'x 30, 40 (Compl. ¶¶ 4, 63) (internal quotation marks omitted).

The "brokering" proceeded as follows. In the fall of 2022, Switzerland began hosting meetings with Credit Suisse and UBS "to the explore the fundamental feasibility of . . . the sale of Credit Suisse" to UBS. App'x 48–49 (Compl. ¶ 93) (internal quotation marks omitted). "Switzerland decided, seemingly as early as November 2022, that only UBS could be considered as a buyer." App'x 52 (Compl. ¶ 103) (internal quotation marks omitted). In late December 2022, Swiss regulators held a meeting with Credit Suisse's chairman "in which [the regulators] demanded a concrete shortlist of potential buyers, the establishment of a virtual data room," and "the development of a scenario for a takeover by UBS." App'x 49 (Compl. ¶ 94) (internal quotation marks omitted).

5

From January through March 2023, "Switzerland was in constant, and sometimes daily, contact with Credit Suisse." App'x 49 (Compl. ¶ 95). During that time, Switzerland "talked Credit Suisse through the possibilities and pitfalls of different potential buyers, the cultural differences between UBS and Credit Suisse, and the synergies between them." App'x 49–50 (Compl. ¶ 95) (internal quotation marks omitted). Credit Suisse and UBS "had minimal direct interactions" and did not directly negotiate the terms of the merger. App'x 51 (Compl. ¶ 99). Instead, "Switzerland negotiated with each bank on behalf of the other." App'x 51 (Compl. ¶ 99). Credit Suisse "was not involved" in the negotiations between Switzerland and UBS. App'x 51 (Compl. ¶ 100) (internal quotation marks omitted). In due course, Switzerland proposed merger terms to UBS over Credit Suisse's objection, leaving Credit Suisse "only able to express its dissatisfaction with the offer after [it was] announce[d] by UBS." *Id.* (internal quotation marks omitted).

On Wednesday, March 15, 2023, the Swiss National Bank extended 50 billion Swiss francs ("CHF," roughly equivalent to 53.6 billion U.S. dollars) in "emergency" liquidity loans to Credit Suisse. App'x 50 (Compl. ¶ 97). Swiss officials told Credit Suisse that, as a condition of the loans: "You will merge with UBS and announce Sunday [March 19] before Asia opens. This is not optional." *Id.* (internal quotation marks omitted). On the same day, Swiss officials "urged UBS

6

to acquire Credit Suisse, and warned that if [UBS] failed to do so, Credit Suisse might be placed into [a receivership]." App'x 50 (Compl. ¶ 96).

On Thursday, March 16, 2023, Switzerland's executive authority enacted an emergency ordinance authorizing the Swiss National Bank to extend further liquidity assistance to Credit Suisse. Under the terms of the ordinance, all such additional loans would be secured by preferential rights in bankruptcy proceedings, and some would be further secured by a federal default guarantee. The ordinance created an express exception to the Swiss federal bankruptcy statute to make possible such preferential rights. The Swiss National Bank then provided Credit Suisse CHF 200 billion in increased liquidity, with half of it guaranteed by Switzerland.

On Sunday, March 19, 2023, the Swiss executive branch amended the emergency ordinance, instituting further measures to stabilize Credit Suisse and facilitate a merger with UBS. As amended, the ordinance waived legal requirements for shareholder approval of the merger and authorized a loss protection guarantee, up to a maximum of CHF 9 billion, to UBS for any losses above CHF 5 billion that UBS might incur in winding up certain Credit Suisse assets. The amended emergency ordinance also decreed that regulators could

7

order Credit Suisse to write down certain securities it had issued—specifically, its Additional Tier 1 securities or "AT1s."[1]

On the evening of March 19, 2023, Swiss officials, UBS, and Credit Suisse announced that UBS and Credit Suisse had entered into a merger agreement. As a term of the merger, Swiss regulators ordered Credit Suisse to write down its $17.3 billion in outstanding AT1s to zero. App'x 29, 31 (Compl. ¶¶ 1, 7). When UBS acquired Credit Suisse, Plaintiffs beneficially owned $372 million in Credit Suisse AT1s, which were held by and cleared through the Depository Trust Company ("DTC") in New York. Credit Suisse objected that the write-down order was "prohibited under the AT1s' contractual terms," App'x 31 (Compl. ¶ 8), but obeyed nonetheless. As a result, "the AT1s were permanently cancelled; the New York-based DTC . . . was ordered [by Credit Suisse] to suspend all clearance and settlement of the AT1s; and beneficial owners of interests in the AT1s immediately and inexorably lost their property." App'x 56 (Compl. ¶ 111).

---

[1] AT1s are a class of securities issued by systemically important banks to meet certain capital requirements. Their governing terms typically provide that they may be written down to zero under certain "conditions (generally tied to the bank's capital position and financial viability)." App'x 45 (Compl. ¶ 77).

Plaintiffs sued Switzerland in the Southern District of New York for conversion, tortious interference, deceptive trade practices, and unjust enrichment based on the write-down order.[2] To rebut the presumption that Switzerland is immune from jurisdiction as a foreign state, the complaint invokes the FSIA's commercial activity exception. The complaint alleges that the write-down order "was 'an act outside the territory of the United States in connection with a commercial activity' under 28 U.S.C. § 1605(a)(2) because it was undertaken by Switzerland, in Switzerland in connection with Switzerland's brokering of the [t]akeover—a commercial activity routinely performed by private parties like investment banks." App'x 40 (Compl. ¶ 63) (quoting 28 U.S.C. § 1605(a)(2)). And the complaint alleges that the write down order " 'cause[d] a direct effect in the United States,' " *i.e.*, the "total loss of all proprietary value" of AT1s held in New York. App'x 40 (Compl. ¶ 64) (alteration in original) (quoting 28 U.S.C. § 1605(a)(2)).

---

[2] Swiss law required anyone who sought to challenge the write-down order in Swiss court to file a claim within thirty days. Plaintiffs missed that deadline. Other AT1 holders who timely sued in Swiss court have since obtained a ruling that the write-down order was unlawful. *See* Bundesverwaltungsgericht [BVGE] [Federal Administrative Court] Oct. 1, 2025, B-2334/2023 (Switz.). Switzerland and UBS have appealed that decision to the Swiss high court.

The district court dismissed for lack of subject matter jurisdiction on the ground that Plaintiffs failed to establish the "commercial activity" element of the commercial activity exception. The court acknowledged that "at least some of" Switzerland's acts, taken "in isolation," "could be properly characterized as 'commercial activity.'" *Creditincome Ltd. v. Swiss Confederation*, 802 F. Supp. 3d 591, 600 (S.D.N.Y. 2025). But it concluded that, as a whole, Switzerland's facilitation of the Credit Suisse acquisition did not constitute commercial activity because "it did not consist of the exercise of 'only those powers that can also be exercised by private citizens.'" *Id.* (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). The court cited, as indication that Switzerland's actions were non-commercial, (a) the "extraordinary nature" of the loans and guarantees extended by Switzerland, (b) the "manner in which Switzerland directed the transaction," and (c) the emergency ordinances Switzerland enacted to facilitate the merger. *Id.* at 600–05.[3] Plaintiffs timely appealed.

---

[3] The district court did not reach the other elements of the exception, such as whether the write-down order was "in connection with" Switzerland's brokering of the merger for purposes of the FSIA. Likewise, the court did not reach the other issues that Switzerland raised in its motion to dismiss.

10

**DISCUSSION**

## I.  The Commercial Activity Exception Generally

"On appeal of a dismissal for lack of subject matter jurisdiction under the FSIA, we review the district court's legal conclusions concerning sovereign immunity *de novo*." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 133 (2d Cir. 2022) (citation modified).

The commercial activity exception—and as relevant here, its so-called "direct-effect clause"—permits an action against a foreign state if it is "based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The FSIA defines a "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 1603(d).

The FSIA does not define the term "commercial" itself.[4] In the leading case, *Republic of Argentina v. Weltover, Inc.*, the Supreme Court embraced "the meaning

---

[4] The framers of the FSIA thought it "unwise to attempt an excessively precise definition" and more prudent to leave courts "a great deal of latitude" in deciding whether an activity is "commercial." H.R. Rep. No. 94-1487, at 16 (1976); S. Rep. No. 94-1310, at 16 (1976).

11

generally attached to that term under the restrictive theory [of foreign sovereign immunity] at the time the [FSIA] was enacted," *i.e.*, relating to " 'trade and traffic or commerce.' " 504 U.S. 607, 612–14 (1992) (quoting *Commercial*, Black's Law Dictionary (6th ed. 1990)). Thus, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id.* at 614.[5]

The FSIA does specify that "[t]he commercial character of an activity shall be determined by reference to the *nature* of the course of conduct or particular transaction or act, rather than by reference to its *purpose*." 28 U.S.C. § 1603(d) (emphases added). So, if "the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce,' " then those actions are commercial. *Weltover*, 504 U.S. at 614 (citation modified). The nature-not-purpose rule is "more

---

[5] The district court maintained that for an activity to be commercial, it must involve "*only* those powers that can also be exercised by private citizens." 802 F. Supp. 3d at 599 (emphasis added by the district court) (quoting *Weltover*, 504 U.S. at 614). To the extent the district court put additional weight on the word "only," we do not read *Weltover* to hold that if a course of conduct was comprised of both commercial and non-commercial acts, then the whole course of conduct *must* be deemed non-commercial. Either way, though, in this case, Switzerland's non-commercial acts sufficed to make the overall course of conduct non-commercial.

easily stated than applied, however, and its application may sometimes depend on the level of generality at which the conduct is viewed." *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 561 (2d Cir. 2020). Thus, "[s]eparating the 'nature' from the 'purpose' of an activity may require a nuanced examination of the context of the acts involved." *Id.*

II.  **Characterizing Switzerland's "Brokering" of the Merger**

Plaintiffs assert in their complaint that their claims are based upon the write-down order, which they argue was an act "undertaken by Switzerland, in Switzerland in connection with Switzerland's brokering of the [t]akeover—a commercial activity routinely performed by private parties like investment banks" such that Switzerland is not entitled to sovereign immunity under the FSIA. App'x 40 (Compl. ¶ 63). The "brokering" is the only activity that the complaint pleads is a "commercial activity" giving rise to jurisdiction. The issue, therefore, is not, as Plaintiffs would suggest, whether the complaint "allege[s] *any* commercial transaction or course of conduct." Reply Br. 12. Instead, the only commercial activity pleaded "in connection with" the write-down order, for purposes of the FSIA, is "Switzerland's *brokering of the* [*t*]*akeover.*" App'x 40 (Compl. ¶ 63) (emphasis added). Thus, the sole question before us is whether Switzerland's

13

"brokering" of the UBS-Credit Suisse merger was a "commercial activity" under the FSIA.

Plaintiffs argue that Switzerland's "brokering" of the merger was a "commercial activity" because practically "every action Switzerland took"—including its extension of loans and guarantees, and the way in which it directed Credit Suisse—"could have been (and customarily would have been) performed by an investment bank operating in the market." Appellant Br. 33. They further contend that to the extent Switzerland's ordinance-making was not commercial, its broader course of conduct still was.

Taking the constituent actions as a whole, we are not persuaded that Switzerland's "brokering" of the merger was enough like the behavior of a private market actor to be a "commercial activity" under the FSIA. On the one hand, we agree with Plaintiffs that the loans and guarantees organized by Switzerland may well be best characterized as commercial in nature under our case law. On the other hand, we note that the manner in which Switzerland directed Credit Suisse to sell itself, as well as Switzerland's use of ordinances to facilitate the merger, were distinctly sovereign in nature. And we find that these latter actions—particularly Switzerland's mandatory directives to Credit Suisse—made the "brokering" as a whole decidedly non-commercial.

14

**A. Switzerland's Loans and Guarantees**

Plaintiffs argue that Switzerland's loans[6] and guarantees were commercial in nature. That may arguably be the case but is not dispositive to whether the "brokering" constituted commercial activity.

The district court acknowledged that "private financial institutions issue loans and loss protection guarantees." *Creditincome Ltd.*, 802 F. Supp. 3d at 600. But it concluded that Switzerland's were not commercial in nature because (1) the loans "were made available only to UBS and Credit Suisse" and were not "negotiable or tradeable," and (2) "the scale of these loans and guarantees far exceeds comparable activities by private actors in the market." *Id.* at 600–02.

The first distinction is unhelpful because direct, non-tradeable financial instruments are regularly issued by private parties. *See, e.g., Hanil Bank v. PT Bank Negara Indon. (Persero)*, 148 F.3d 127, 129–31 (2d Cir. 1998) (letter of credit as commercial activity).

---

[6] Plaintiffs contend that the loans were merely "brokered" by Switzerland and that "it was a different entity—the [Swiss National Bank]—that extended the loans and therefore engaged in the conduct that Switzerland (erroneously) claims was not in the nature of an ordinary commercial transaction." Reply Br. 13. For purposes of this opinion, we assume without deciding that the loans were acts attributable to Switzerland.

15

As to the second point: Whether the "scale" of the loans and guarantees makes them non-commercial in nature is a harder question, but we cannot say with certainty that it does. To be sure, there is some appeal to treating a loan or guarantee so large that no private party would provide it as a non-commercial act. Yet we have routinely applied the commercial activity exception to sums not usually contemplated in private deals. *See, e.g.*, *Attestor Master Value Fund LP v. Republic of Argentina*, 113 F.4th 220, 229 (2d Cir. 2024) (suit for $62.3 billion in Argentine debt).[7] Moreover, the facts before us do not suggest that no private party *could* extend loans and guarantees at the speed and scale Switzerland did. They instead indicate that no private party *would* because no private party would be so committed to the "purpose of addressing the Credit Suisse crisis." Appellee Br. 27. In other words, "a nuanced examination of the context" of the loans and guarantees, *Pablo Star*, 961 F.3d at 561, may well mean that their extraordinary

---

[7] The cases that Switzerland cites in favor of singling out "extraordinary financial assistance," Appellee Br. 25–30, are not on point. *Weltover* noted that the Argentine debt instruments the Court found commercial were tradeable and negotiable, but it did not hold that non-tradeable, non-negotiable loans are per se non-commercial. *See* 504 U.S. at 615. *EM Ltd. v. Republic of Argentina* dealt with International Monetary Fund loans issued exclusively to sovereign states under a treaty regime. *See* 473 F.3d 463, 482–84 (2d Cir. 2007). And *Anglo-Iberia Underwriting Management v. PT Jamsostek* addressed the commercial treatment of employing public servants, not the extension of loans and guarantees. *See* 600 F.3d 171, 178 (2d Cir. 2010).

scope is a function of purpose rather than nature—and hence would not render the loans and guarantees sovereign action, rather than commercial activity, under the FSIA.

Accordingly, Switzerland's extension of loans and guarantees are arguably commercial in nature. But even if so, that does not make the brokering, when viewed as a whole, commercial.

**B. Switzerland's Direction of Credit Suisse**

Viewed as a whole, Switzerland "did more than simply advise a client or broker a deal." *Creditincome Ltd.*, 802 F. Supp. 3d at 603. Switzerland, exercising its sovereign authority, coerced Credit Suisse into selling itself to UBS.

Plaintiffs first contend that Switzerland's dealings with UBS, which were "unquestionably . . . free from any coercion," "alone satisfy the commercial-activity element, regardless of [Switzerland's] separate dealings with Credit Suisse." Appellant Br. 44–45. But even if Switzerland's dealings with UBS were basically commercial and did not rise to coercion, that was just a small piece of the broader course of conduct and cannot "alone satisfy the commercial-activity element." *Id.*

Plaintiffs next argue that the course of conduct was "commercial at least up until March 15, 2023, when Switzerland informed Credit Suisse that a merger with

17

UBS was 'not optional.' " *Id.* at 45 (quoting App'x 50 (Compl. ¶ 97)). But as the complaint makes clear, Switzerland was strongarming Credit Suisse long before that. "[S]eemingly as early as November 2022," Switzerland unilaterally "decided . . . that only UBS could be considered as a buyer." App'x 52 (Compl. ¶ 103) (internal quotation marks omitted). In December 2022, Switzerland "demanded" from Credit Suisse "a concrete shortlist of potential buyers, the establishment of a virtual data room," and "the development of a scenario for a takeover by UBS." App'x 49 (Compl. ¶ 94) (internal quotation marks omitted). And from January to March 2023, Switzerland excluded Credit Suisse from negotiations altogether and proposed merger terms to UBS over Credit Suisse's objection. *See* App'x 51–52 (Compl. ¶ 100). It is manifest that Switzerland assumed a peremptory posture toward Credit Suisse from the outset of the "brokering" and maintained it through closing in March 2023.

Plaintiffs further contend that even if Switzerland coerced Credit Suisse, the negotiations were still commercial because "[c]ourts often hold that sovereign

18

activity retains its commercial character even when backed by coercive threats."
Appellant Br. 46. But neither case cited for that proposition is persuasive.[8]

Finally, Plaintiffs claim that allowing the FSIA to immunize sovereigns who coerce businesses "would eviscerate the commercial-activity exception in countries that lack rule-of-law protections and undermine protections for U.S. firms that invest abroad." *Id.* This policy argument cannot overcome the clear intent of the statute or our application of it to the allegations we are faced with here.

In sum, while Switzerland at times negotiated in the manner of a private player with UBS, it strongarmed Credit Suisse in a manner that only a sovereign could, and it did so throughout the course of the "brokering." That defeats Plaintiffs' characterization of the "brokering" as commercial.

---

[8] Plaintiffs cite *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990), and *Missouri ex rel. Bailey v. People's Republic of China*, 90 F.4th 930 (8th Cir. 2024). *Foremost-McKesson* nowhere mentions government coercion; only the underlying complaint does. *Bailey* asserts that China's "[t]aking over [of] mask-producing factories" in anticipation of COVID-19's spread was an "anticompetitive" action of a "private player" in the market. 90 F.4th at 938. That is not the law of this circuit. *See, e.g., Garb v. Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006) ("Expropriation is a decidedly sovereign—rather than commercial—activity.").

### C. Switzerland's Ordinance-Making

Plaintiffs scarcely dispute that the emergency ordinance and its amendment were non-commercial (sovereign) acts by Switzerland. At most, Plaintiffs suggest that changing the legal requirements for the merger was commercial insofar as "[p]rivate dealmakers routinely seek such accommodations from regulators." Appellant Br. 49. But of course, Switzerland did more than "seek" an accommodation; it declared one unilaterally as no private party could.

Plaintiffs argue that even if the ordinance was sovereign in nature, a "single uniquely sovereign act" should not automatically confer immunity over a course of conduct that was broadly commercial. Appellant Br. 52. That might be so in principle. But Switzerland's use of ordinances was more than a "single uniquely sovereign act." *Id.* Switzerland's use of ordinances not only authorized loans and guarantees, created an exception to the normal order of creditor recovery, and abrogated shareholders' ability to vote down the UBS-Credit Suisse merger; it also was the finishing touch on a merger already characterized by sovereign coercion. All these interventions, coming as they did atop Switzerland's coercive directives to Credit Suisse, totally negated the state-brokered deal's resemblance to a privately brokered one.

*       *       *

We conclude that although Switzerland might have acted in the manner of a private market player in some respects, its use of sovereign authority to dominate Credit Suisse throughout the "brokering," plus its use of ordinances to push the merger across the finish line, were fundamentally different types of actions than those by which a private party engages in "trade and traffic or commerce." We therefore hold that Switzerland's "brokering" was not "a commercial activity" for purposes of the FSIA.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.